MEMORANDUM OF DECISION
This case is a petition brought by the Commissioner of the Department of Children and Families (DCF) to terminate the parental rights of Ms. Terri S. and Mr. Jesus A., who are the biological parents of Manuel David N., born on October 1993 On June 2, 2000, the respondent mother appeared before the court with her counsel and entered her written consent to the termination of her parental rights. After canvassing her, the court,Quinn, J., found that she had made this decision knowingly and voluntarily with the assistance of competent counsel and accepted her consent. As to the respondent father, the petition alleges two separate CT Page 1813 bases for terminating the his parental rights: (1) that Mr. A. has abandoned his child by failing to maintain a reasonable degree of interest, concern, or responsibility as to Manuel's welfare, and (2) that there is no ongoing parent-child relationship between Manuel and the respondent and allowing further time to establish such a relationship would be detrimental to Manuel.
The trial of this case was held before this court on October 11, 2000. The respondent father was not physically present at trial, as he is incarcerated in the Commonwealth of Pennsylvania; but he participated in the trial by way of amplified telephone hookup, which allowed him to listen to all court proceedings and speak with the court or counsel. Mr. A. was represented by his attorney. The petitioner and the minor child were represented by their respective counsel throughout the proceeding.
The petitioner called as its witnesses two DCF social workers, Mary Howard and Le Anne Alley, and introduced into evidence as exhibits a "Social Study for Termination of Parental Rights" (Pet.'s Ex. 1) and an "Addendum to Social Study for the Termination of Parental Rights" (Pet.'s Ex. 2). The respondent himself testified in his own case.
The court finds that the Child Protection Session of the Superior Court, Juvenile Matters Division, has jurisdiction over the pending matter. The court finds that both parents were served with the petitions and have appeared through counsel. No action is pending in any other court affecting custody of the child.
 I — FACTUAL FINDINGS
The court has carefully considered the verified petition, all of the evidence, including the social study and addendum entered into evidence as exhibits, and the testimony presented, according to the standards required by law.[2] Upon such consideration, the court finds that the following facts were proven by clear and convincing evidence at trial:
 A. EVENTS BEFORE THE FILING OF THE TERMINATION PETITION IN MARCH 1999
Manuel David N. was born on October 1993. His parents had ended a one-year relationship approximately three months after Manuel's conception, and by the time of his birth, his father, the respondent here, had moved back to Mr. A.'s native state of Pennsylvania. (Pet. Ex. 1 at 5 and 7.) From the time of Manuel's birth through the date of trial here, the respondent father had never seen his son in person. Addicted to cocaine from an early age (Pet. Ex. 1 at 6), Mr. A. was arrested for possession of drugs shortly after returning to Pennsylvania in 1993 and sentenced to five years incarceration. (Id. at 6 and 7.) Mr. A. initially CT Page 1814 denied being Manuel's father and entered a formal denial to paternity in a Pennsylvania court proceeding but eventually acknowledged being Manuel's father after his sister told him that Manuel looked just like him. (Id.) While in prison, he participated in various programs to recover from drug abuse and was eventually released in 1999 to a halfway house. (Id. at 7; test, of resp.)
When his father moved away, Manuel stayed in Connecticut with his mother. Over the next four years, she was involved with two other men, John S., to whom she was married for three years until they divorced in 1996, and then Julio A. Although the evidence does not establish precisely when, during these years Manuel was physically and sexually abused (Pet. Ex. 1 at 8; test. of Mary Howard); he witnessed his mother having sexual relations with her boy friend several times. (Pet. Ex. 1 at 8.) Julio had a severe alcohol problem and was extremely violent toward Manuel's mother. (Id. at 6.) Manuel witnessed the domestic violence. (Test. of LeAnne Alley.)
After one such incident of domestic violence, DCF removed Manuel from his mother's care on an Order of Temporary Custody (OTC), which the court, Grogins, J., granted ex parte on May 29, 1997. Both the order to show cause and an accompanying neglect petition filed that same day referred to Manuel's father as "unknown." An affidavit of a DCF social worker appended to the petition regarding the department's "diligent search for the parent's identity and/or location" averred that "Mother has not complied with the Department of Social Services to establish paternity"; an unsworn "Summary of Facts" appended to the petition asserted that the mother's welfare benefits had been discontinued because of her failure to sign paperwork for a blood test. Both allegations are consistent with the fact that after Mr. A. had denied paternity in a Pennsylvania court proceeding, the respondent mother never appeared for blood testing ordered to confirm his paternity. (Pet. Ex. 1 at 7.)
The department's neglect petition alleged that Manuel was neglected in that he was being permitted to live under conditions, circumstances or associations injurious to his well-being and was uncared for in that his home could not provide the specialized care that his physical, emotional, or mental condition required. On July 8, 1997, Ms. Terri S. entered a plea of nolo contendere to the allegations of neglect and uncared for, and the court, Riefberg, J., committed Manuel to DCF for a period not to exceed twelve months. On May 5, 1998, the court extended the commitment for another twelve months.
After removing Manuel from his mother's care, the department first placed him in a DCF-licensed foster home. That foster family had difficulty caring for him and keeping him under control. While there, he CT Page 1815 had temper problems, and was extremely aggressive and sexually reactive in nature. He would defecate inappropriately both inside and outside the house. (Test. of Mary Howard.) Within only a few months DCF removed him from that home, after he fondled another child in the foster home, and placed him on July 31, 1997, in a relative foster home with his paternal uncle and aunt, the T. family. (Pet. Ex. 1 at 7.) He got along well with his foster parent relatives and over time came to consider them as his parents. (Test. of Mary Howard.)
The evidence about Manuel during this period shows a young boy with serious problems. Having spent in his early years in a highly sexualized environment, where he had seen his mother's sexual activity and been sexually molested, Manuel did not perceive or understand sexual norms or limits. To the contrary, his own behavior had become highly sexualized in response to his early environment, and he was totally unaware that such behavior would be considered unacceptable in other households. (Id. at 8.) In October 1997 DCF had a psycho-sexual evaluation conducted on Manuel. The written report from that evaluation concluded that Manuel was "a high risk for developing a sexual addiction and possible developing as a sex offender. Manuel has shown signs of identifying with male perpetrators of domestic violence, as he has put together violence and his mother's affection." (Id. at 8.) DCF began providing weekly individual therapy sessions for Manuel with a licensed clinical social worker to address his sexualized behaviors. (Id. at 8 and 11; Test. of LeAnne Alley.)
In January 1999 Manuel enrolled in a Head Start program but was asked to leave only a few months later, in May 1999, because teachers there could not manage his increasingly aggressive behavior. (Id. at 7 and 8.) He would have temper tantrums and trouble playing with the other children.
Over time, however, though he still had problems acting out, DCF believed that Manuel was beginning to make progress in improving his behavior. (Id. at 9.) He had fewer problems in school after entering kindergarten, where his teacher reported great progress on Manuel's part both emotionally and academically. (Pet. Ex. 1 at 8.) He grew attached to his foster parent relatives, and DCF regarded him as happy and secure in his placement there. (Id.)
While Manuel was living with his paternal aunt and uncle, he regarded the respondent-father merely as an uncle or a friend of the T. family. (Id.) When once asked by his DCF social worker if he knew about the respondent, Manuel said that the respondent was in prison because he had done something bad and gave no indication that he regarded Mr. A. as his biological father. (Test. of Mary Howard.) His father contacted him only CT Page 1816 sporadically by telephone. Manuel would get upset after those contacts.[3]
(Id.) Whenever any mention was made to Manuel of either his father or mother, Manuel would react negatively. (Id.) Mr. A. sent Manuel a Christmas card in 1998. (Id.) His father never contacted DCF, however, to inquire about his son; instead, during this period, the department's social worker initiated all contacts between Mr. A. and DCF, who would call or write him at the prison in Pennsylvania. In those discussions with DCF staff, he never asked about Manuel's medical condition, his special needs, or his educational progress but would instead ask about his own legal rights. He never asked DCF workers to participate in any of the department case reviews about Manuel or for information about the results of those reviews. (Id.) Other than the sporadic telephone calls and the one Christmas card in 1998, there is no credible evidence of other contacts between Manuel and his father, or efforts by his father to contact Manuel, during this time period.[4]
 B. EVENTS SINCE FILING OF THE TPR PETITION IN MARCH 1999
DCF filed the petition for termination of parental rights on March 29, 1999. At some unspecified point, the department had obviously located Mr. A. at the State Correctional Institution in Coal Township, Pennsylvania, as the petitioner moved on March 29, 1999, for an order permitting service of the TPR petition on him there by certified mail, restricted delivery. On March 30, 1999, the court, Swienton, J., granted that motion. The court file contains an envelope addressed to the respondent at that location and stamped by the US Postal Service "Refused can't ID inmate as addressed." The file also contains an amended sheriff's return dated March 31, 1999, addressed to the respondent at that address and including an apparent inmate identification number. The amended return states that "Mr. A. had received the TPR petition; and a signed postal receipt for restricted delivery to the respondent is attached. On April 21, 1999, the court, Trombley, J., extended the commitment to July 8, 2000, confirmed service on the respondent-father, and appointed counsel for him.
In March 1999, Manuel was living with the T. family, and DCF believed him to be thriving there. (Id. at 9.) In November 1998 and July 1999, the respondent father told DCF social worker Mary Howard that he would agree to relinquish his parental rights and wanted his brother to adopt Manuel. (Test. of Mary Howard.) He told Ms. Howard that he intended to remain in Pennsylvania after his release from prison and did not believe he could provide the care that Manuel needed. (Id.)
Yet although DCF had regarded the T. family as a potential adoptive placement for Manuel, in November 1999 the department removed him from that home after it substantiated a report that Mr. T. had sexually abused CT Page 1817 one of his own daughters. DCF then placed Manuel in another pre-adoptive foster home, where his half-sister Arianna had lived since her removal from their mother at birth in April 1998. (Id.) Manuel has lived there ever since. He has adjusted well to this new foster home, and his negative behaviors now occur less frequently and with less severity. There have been no incidents of inappropriate sexualized behavior on Manuel's part in the new foster home. His therapist believes that "the structure, commitment, and dedication the foster family provides has helped in [Manuel's] treatment." (Pet. Ex. 2 at 2.) Manuel has had no contact with the respondent since then. (Nor has the respondent initiated any contact with the department since his re-arrest and re-incarceration.) Manuel has never asked about his father, no longer has any memory of his father and does not refer to him as his father. Manuel has developed a bond with his new foster parents, who hope to adopt him and his sister. (Test, of LeAnne Alley.) At the time of trial, the DCF social worker testified that though his attachment to the new foster family was still somewhat weak, he nonetheless already viewed them as his psychological parents. (Id.) He has enjoyed being placed with his half-sister. (Id.)
Despite the progress he has made in addressing his problems, however, Manuel remains a child with many needs. His therapist has reported that much of his acting out behavior derives from his having never felt secure. She has diagnosed him as having an impulse disorder, and states that it is important for him to be a permanent part of a family to which he might develop a healthy attachment. Because of his many problems and the damaging things to which he was exposed as a younger child, he still needs continuing and frequent therapy. He also needs parental figures who will understand his special needs and problems, will be aware that he requires active supervision because of his history of sexualized behavior, in part to protect other children in the household or neighborhood, and will themselves get actively involved in Manuel's treatment. (Test. of LeAnne Alley.) His current foster family is aware of Manuel's problems, is already involved in working on them with him, and is willing to continue doing so in the future. (Id.)
 II — ADJUDICATORY DECISION[5] A. REUNIFICATION EFFORTS
To terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts, provided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110
CT Page 1818 or section 17a-111b that such efforts are not appropriate." General Statutes § 17a-112 (j)(1). Here, the petition alleges that the respondent was unable or willing to benefit from reunification efforts.
The court finds by clear and convincing efforts that the department made reasonable efforts to locate the respondent, and in fact twice found his whereabouts, first to serve the TPR petition on him and then again after Mr. A. was re-arrested.
The respondent has asked this court to find that the department failed to make reasonable reunification efforts and to order additional such efforts. For the period before Manuel's removal from the T. family in November 1999, the court finds by clear and convincing evidence that reunification efforts were not then reasonable or appropriate. The respondent himself informed the department that he did not want to be reunited with Manuel, that upon his release from incarceration he would be unable to provide the care that Manuel needed, that he wanted his brother and sister-in-law to adopt Manuel, and that he intended to relinquish his parental rights voluntarily. This evidence clearly and convincingly establishes that Mr. A. was, at that point, unwilling or unable to benefit from reunification efforts. As a result, the department acted reasonably and appropriately in not seeking to reunify Manuel with his father.
In the period after November 1999, the only contact that the respondent initiated with the department was the one letter he sent from the halfway house giving his address there. After sending that letter; however, he never made any more efforts to contact the department. DCF then tried unsuccessfully to reach him there. From the respondent's explanation to DCF for not contacting the department again or providing any other address — that he was on the street and did not have the time to do so, the court concludes that the halfway house at some point released the respondent back into the community; after that DCF had no address for the respondent or way to reach him. There was thus a significant period when DCF did not know of his whereabouts, and reunification efforts would have been futile and pointless then. Following his re-arrest, he did not inform the department where he was, and DCF learned of its whereabouts only in carrying out its own obligation to locate him.
Once DCF located Mr. A. again upon his re-incarceration, were reunification efforts then suddenly necessary, reasonable and appropriate? At that point, a TPR petition had been pending several months. Mr. A. told DCF that he was facing incarceration until possibly the year 2004. Yet such incarceration would alone not be an adequate basis to preclude reunification efforts. Nor would the fact that his only contacts with DCF were initiated by the department be sufficient by CT Page 1819 itself to avoid further reunification efforts.[6] Those facts do not stand alone, however. Taking them both into consideration, along with his previous admission to DCF that he would be unable, upon his release, to care for Manuel's needs, the fact that he justified his failure to contact DCF again after his release to the halfway house on the grounds that he did not have time to do so after he was back "on the street," and his failure to express any interest in Manuel or his needs when he talked with DCF after his re-incarceration, the court finds by clear and convincing evidence that Mr. A. was unwilling or unable to benefit from reunification efforts at that point. The lynchpin of this analysis is reasonableness.[7] Clear and convincing evidence establishes that it was no longer reasonable for DCF to seek to reunify Manuel with his father.
B. STATUTORY GROUNDS FOR TERMINATION
Trial of a petition to terminate parental rights has two phases, adjudication and disposition. To prevail in a non-consensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See In re Michael B., 49 Conn. App. 510, 512, 714 A.2d 1279, cert. denied, 247 Conn. 919, 722 A.2d 807 (1998); General Statutes § 17a-112
(j)(3). "In the adjudicatory phase of a termination hearing, the trial court determines if one of the statutory grounds for termination of parental rights is proven by clear and convincing evidence. In making the adjudicatory determination, the court is limited to considering events preceding the filing of the termination petition or the latest amendment."In re Tabitha P., 39 Conn. App. 353, 367, 664 A.2d 1168 (1995); Practice Book § 33-3(a).
The adjudicatory date here is March 29, 1999, the date of filing of the petition. The petitioner claims two separate statutory grounds for terminating Mr. A.'s parental tights: abandonment and no ongoing parent-child relationship. With respect to the statutory grounds for termination of parental rights, the court finds the following to have been established by clear and convincing evidence:
 1. Abandonment — § 17a-112 (j)(3)(A)
The petitioner has asserted, as one of the statutory grounds for terminating the parental rights of Mr. A., that he abandoned Manuel. Section 17a-112 (j) of the General Statutes provides that "[t]he Superior Court . . . may grant a petition filed pursuant to this section if it finds by clear and convincing evidence . . . (3) that: (A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to CT Page 1820 the welfare of the child. . . ." The court must determine whether the petitioner has proven, by clear and convincing evidence, that Mr. Jesus A. had, as of the adjudicatory date of March 29, 1999, abandoned his minor child, Manuel.
"Abandonment focuses on the parent's conduct. . . . A lack of interest in the child is not the sole criterion in determining abandonment. . . . General Statutes [Rev. to 1995] § 17a-112 (b)(1) [now § 17a-112
(j)(3)(A)] defines abandonment as the [failure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. . . . Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . ." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122
(1993).
The statute requires DCF to show by clear and convincing evidence that a parent has failed to maintain a reasonable degree of interest in the welfare of his or her child. "Maintain implies a continuing, reasonable degree of concern" not "a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child." "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. . . ." (Internal quotation marks omitted.) Id. Mr. A. has shown none of this behavior.
Applying this standard, the court finds that the evidence here irrefutably establishes, by clear and convincing evidence, that Mr. A. has abandoned Manuel — not from the mere fact that he has been incarcerated most of the time since his child was born, but because he has failed to maintain a reasonable degree of interest in the welfare of his child. "[T]he inevitable restraints imposed by incarceration do not in themselves excuse a failure to make use of available though limited resources for contact with a distant child." In re Juvenile Appeal,187 Conn. 431, 443, 446 A.2d 808 (1982). The voluntary illegal acts that lead to a period of separation of the parent from the child are a factor in determining whether or not there has been abandonment. Id. at 442. The court should, for an incarcerated parent, as for any other parent alleged to have abandoned a child, consider whether the parent has made efforts to maintain contact with the child, to express love and affection for the CT Page 1821 child, to express concern regarding the well-being of the child, to provide financial assistance if possible and to furnish appropriate religious and social guidance.
A parents interest in his child must not merely be sporadic in nature, but must exist on a consistent and continuing basis. See In re MigdaliaM., 6 Conn. App. 194, 210, 504 A.2d 533, cert. denied, 199 Conn. 809,508 A.2d 770 (1986)." In re Shane P., 58 Conn. App. 244, 256, ___ A.2d ___ (2000). Mr. A. has never seen his son in person. He has been completely uninvolved in Manuel's life since birth. He had only infrequent contact, in the form of one Christmas card to his son and sporadic telephone calls with Manuel, in the months between his son's removal from his mother's care and the filing of the termination petition. He never contacted DCF regarding Manuel's well-being, to see his son, or to have any contact with him. Mr. A. never sent the department any gifts, cards, or letters for Manuel after his son entered foster care. He did not provide Manuel with any financial support. The court thus finds that the evidence clearly and convincingly establishes that Mr. A. had, as of the adjudicatory date, abandoned Manuel, by failing to maintain a reasonable degree of interest, concern or responsibility as to the welfare of his son. He has done nothing since then to repudiate that abandonment and involve himself meaningfully in Manuel's life.
 2. No Ongoing Parent-Child Relationship — § 17a-112 (j)(3)(D)
The second statutory grounds alleged for termination is the petition's allegation that there is no ongoing parent-child relationship between Mr. A. and Manuel pursuant to General Statutes Section 17a-112 (j)(3) (D) that
 there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child; . . . .
Under this section, the court must "undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." In Re John G., 56 Conn. App. 12,22, 740 A.2d 496 (1999). CT Page 1822
The statutory definition of an "ongoing parent child relationship" as "the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child" is, as our Supreme Court has observed, "inherently ambiguous when applied to noncustodial parents," such as the respondent here. In Re Michael M., 29 Conn. App. 112, 614 A.2d 832
(1992). The court has resolved this ambiguity by construing the statutory definition to "contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." Id. "In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent." (Citations omitted.) In re John T., supra at 23. This standard contemplates a relationship that has some positive attributes. In re Jessica M.,217 Conn. 459, 470, 586 A.2d 597 (1991).
The evidence establishes clearly and convincingly that, both on the adjudicatory date and at the time of trial, there was no ongoing parent-child relationship between Mr. A. and Manuel. The respondent has never met any of Manuel's day-to-day needs. He has never provided any guidance or nurture for his son. As of the adjudicatory date, there was no actual relationship between them, only occasional and sporadic telephone conversations while Manuel lived with the T. family that do not, by themselves, constitute a relationship. The effect on Manuel of his father's noninvolvement was predictable. When the TPR petition was filed, his son knew of him only as an uncle or family friend, not as his father. Since then, he has lost all memory of his father. By the time of trial, Manuel no longer remembered his father, did not know him to be his biological parent, regarded his present foster parent as his psychological parents, and had no present positive feelings whatsoever for his father.
"To satisfy the second prong [of the analysis], the trial court was required to determine whether it would be in the child's best interest to allow additional time for the establishment of a parent-child relationship. . . . The "best interest' standard, therefore, does not become relevant until after it has been determined that no ongoing parent-child relationship exists." (Citation omitted.) In re Kezia M.,33 Conn. App. 12, 22, 632 A.2d 1122, cert. denied, 228 Conn. 915,636 A.2d 847 (1993). The factors to be considered in deciding whether it would be in his best interest to permit further time for a relationship with his father to develop include "(1) the length of stay with her foster parents, (2) the nature of her relationship with her foster CT Page 1823 parents, (3) the degree of contact maintained with the natural parent and (4) the nature of her relationship to her natural parent. Id.
Nearly seven years old at the time of trial, Manuel had then been in foster care for two and a half years, more than one-third of his life. He had lived for almost one year with his current foster family, with whom DCF intends to place him for adoption should the court grant this petition. Although his attachment to those foster parents was still developing, he already regarded them as his psychological parents. Manuel has had no contact with his father for almost a year and has no relationship at all with the respondent. Mr. A. told the DCF social worker that his release date might be as late as 2004, three years from now. Waiting that long to offer this young child the stability of a permanent home would surely interfere with his progress in overcoming his behavior problems. By moving away from his son in 1993 and then getting arrested and incarcerated, both then and in 1999, Mr. A. was, by his own conduct, "the primary cause of creating the lack of a parent-child relationship, which existed at the time the petition was filed"; In reShane P., 58 Conn. App. 234, 241, ___ A.2d ___ (2000); and at the time of trial. It was the ineluctable consequence of the respondent's own conduct that Manuel has no present feelings for or memories of his biological father.
Although the evidence is unclear as to precisely when Mr. A. will next be released from prison, his release date may be as long as three years hence. The respondent has admitted that he did not believe he could care for Manuel's special needs, and exhibited his lack of interest in maintaining contact with Manuel after his prior release to the community (he was "too busy"). Much of Manuel's impulsive behavior problems stems from the frequent disruptions in his life. (Test. of LeAnne Alley.) It is obvious and apparent that this young child, as would any his age, needs permanency and stability; his own special needs dictate an end to changing placements. The court thus finds by clear and convincing evidence that it would be detrimental to Manuel's best interests to allow more time for a parental relationship to develop.
 III — DISPOSITION
"A hearing on a petition to terminate parental rights consists of two phases, adjudication and disposition. . . . If the trial court determines that a statutory ground for termination exists, it proceeds to the dispositional phase. In the dispositional phase, the trial court determines whether termination is in the best interests of the child." (Citation omitted; internal quotation marks omitted.) In re Roshawn R.,51 Conn. App. 44, 52, 720 A.2d 1112 (1998). In making the dispositional decision in a nonconsensual case, "the court is mandated to consider and CT Page 1824 make written findings regarding seven factors "specified in General Statutes § 17a-112 (k).[8] In re Tabitha P., 39 Conn. App. 353,664 A.2d 1168 (1995). Unlike the adjudicatory phase, on disposition the court may consider information through the close of the evidentiary hearing. Practice Book § 33-5. In the dispositional phase of this case, the court has considered the evidence and testimony related to circumstances and events up to and including October 11, 2000, the date upon which the evidence in this matter was concluded.
A. REQUIRED STATUTORY FINDINGS.
The court makes the following written findings, as required by General Statutes § 17a-112 (k).[9] The court has considered these factors and its findings in determining whether it is Manuel's best interests to terminate Mr. A.'s parental rights. In re Quanitra M., 60 Conn. App. 96
(2000), cert denied 255 Conn. 903 (2000).
 (1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by an agency to facilitate the reunion of the child with the parent — § 17a-112 (k)(1)
DCF offered no services directly to the respondent to facilitate reunion. Until late 1999, the respondent himself eschewed any interest in reunification and supported the department's plan then to let his brother adopt Manuel. After his re-incarceration, reunification services were no longer appropriate.
 (2) Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980, as amended § 17a-112 (k)(2)
Reasonable efforts to reunite Manuel with his father were not appropriate in this case, as the respondent was unwilling or unable to benefit from them.
 (3) The terms of any applicable court order entered into and agreed upon by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order — § 17a-112 (k)(3)
No such court order was ever entered in this case with regard to this respondent. CT Page 1825
 (4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties — § 17a-112 (k)(4)
Manuel has no positive feelings of attachment or positive emotional ties to the respondent. He is bonded to his foster parents and regards them as his psychological parents. He was also bonded to his previous foster parents, from whom DCF appropriately removed Manuel after a substantiated incident of adult sexual abuse of a child in that household. Manuel has not seen his biological mother for two and a half years, since March 1998. There is no evidence as to whether he has any present feelings or emotional ties to her, but she has consented voluntarily to a termination of her parental rights.
(5) The age of the child — § 17a-112 (k)(5)
Manuel was, at the time of trial, six years old, and within less than two weeks of turning seven years old. At the time of this decision, he is seven.
 (6) The efforts the parent has made to adjust his circumstances, conduct, or conditions to make it in the best interest of the child to return him to his home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child — § 17a-112 (k)(6)
The respondent has made virtually no efforts to adjust his conduct, circumstances, or conditions to make it in Manuel's best interests to be united with Mr. A. The respondent maintained only sporadic contact with his child during the first foster placement, had no contact with Manuel after his release to the halfway house, wrote DCF only once after his release, was "too busy" upon his return to the community to contact DCF, and never notified DCF of his address after leaving the halfway house.
 (7) The extent to which a parent has been prevented fromCT Page 1826 maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent — § 17a-112 (k)(7)
No unreasonable act or conduct of any person has prevented Mr. A. from having a meaningful relationship with his son. Nor have his economic circumstances limited such a relationship. His own decision to move from Connecticut in 1993 and his actions that led to his arrests and incarceration in 1993 and 1999 are what led to the present situation.
B. BEST INTERESTS OF THE CHILD — § 17a-112 (j)(2)
The court is next called upon to determine whether termination of the parental rights of Ms. Terri S. and Mr. Jesus A. would be in the best interests of his child, Manuel.[10] From the evidence offered at trial, the court finds by clear and convincing evidence, for the reasons stated, that Manuel's best interests require termination of the parental rights of each respondent.
Manuel is now seven years old — at the time of trial, he was two weeks short of that age. Since his removal from his mother's care in 1997, he has been in three different foster homes. As the mother has voluntarily consented to the termination of her parental rights, she is in no position to assume a parenting role for Manuel. His father has been incarcerated for many years, except for a brief respite in 1999. Although Mr. A., to his credit, completed various courses and programs offered to him in prison, he was re-arrested for a new offense and re-incarcerated within months after his release in 1999. His father may be incarcerated for as much as another three years. By the time of trial, he had had no contact with his father for approximately a year. He has never seen his father, does not know that Jesus A. is his biological parent, has no memory or positive feelings toward his father, and has no relationship whatsoever with the respondent. When he did still recall his father, while living with his uncle Mr. T., any contact with his father would cause him great distress and to act out negatively with temper tantrums and behavior problems with other children.
Manuel needs and now lives with parental figures who understand his needs, are involved in his treatment, and are committed to supervising his behavior and helping him overcome his problems. It is equally important that Manuel's parents be able to care for his special needs; yet his father has admitted that he would be unable to do so upon his release. He is bonded to his current foster parents, gets along well with them, is happy to live with his half-sister, and has begun to address his CT Page 1827 behavioral problems. Since much of Manuel's acting out behavior stems from his feelings of insecurity, it is important for him to be a permanent part of a stable family, without risk of being removed and placed somewhere else once again.
In her well-reasoned closing argument, counsel for the minor child argued that Manuel needs to begin forming family ties now, before he loses the ability to do so, and that delay would be irreparably harmful to him. The court concurs. In view of Manuel's impulsive behaviors and his difficulty forming attachments, he needs to know now that he has a permanent place to live. Terminating the parental rights of his mother and father will enable him to reside in a stable and secure setting that can help him address his many problems.
Based upon the foregoing, the court concludes that it is in Manuel's best interests to terminate the parental rights of Terri S. and Jesus A. The court makes this finding in consideration of Manuel's need for a secure and permanent environment that will help him address the many behavior problems stemming from his troubled and damaged past, the secure and nurturing relationship that Manuel has with his foster parents at this time, and the totality of circumstances existing in this case.
 IV — ORDER OF TERMINATION
The court, having considered all the statutory criteria and having found by clear and convincing evidence that grounds exist for termination of parental rights and having determined, upon all of the facts and circumstances presented, that it is in the child's best interests to terminate the parental rights of Terri S. and Jesus A. accordingly ORDERS:
The parental rights of Terri S. and Jesus A., are hereby terminated as to Manuel David;
The Commissioner of the Department of Child and Families is hereby appointed the statutory parent for Manuel for the purpose of securing an adoptive family or other permanent placement for this child; and
Within thirty days of this judgment the Commissioner shall submit a written report addressing such permanency plan; DCF shall file such further reports as are required by state and federal law.
BY THE COURT
STEPHEN F. FRAZZINI JUDGE OF THE SUPERIOR COURT CT Page 1828 CHILD PROTECTION SESSION